UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

C.G. and
T.D.,

Plaintiffs,

v.

Safi Investment, Inc.,

Defendant.

CIVIL ACTION FILE

NO. 1:26-cv-2999-MLB

**JURY TRIAL DEMANDED**

**FIRST AMENDED COMPLAINT**

1.

Plaintiffs C.G. and T.D. are victims of sex trafficking at the Super 8 located at 4979 Old National Highway, College Park, Georgia 30349 ("Super 8"). C.G. was sold for sex at the hotel beginning in 2016, when she was just 17 years old. T.D. was sold for sex at the hotel for weeks in the spring and summer of 2013. Given the nature of the case, Plaintiffs are identified in this Complaint by their initials. Plaintiffs' counsel will disclose Plaintiffs' full names to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.

2.

Defendant Safi Investment, Inc. is a corporation authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can

be made on Safi Investment, Inc. by serving its Registered Agent: Kazi Nahid, 4001 Oak Forest Circle, Marietta, Georgia 30062.

3.

Defendant has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Defendant.

5.

Defendant knew that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Plaintiffs' trafficking. Defendant knew because:

(a) Defendant knew about Plaintiffs while they were sold for sex at the Super 8;

(b) Defendant's employees knew of and permitted sex trafficking and prostitution to occur at the Super 8;

(c) Defendant knew about several other sex trafficking victims at the Super 8 before, during, and after Plaintiffs;

(d) Defendant knew about frequent and similar crimes occurring at the Super 8;

(e) Defendant knew about the reports of Super 8 guests regarding sex trafficking and prostitution-related activities; and

(f) Defendant had knowledge of sex trafficking generally in the Atlanta area and at the Super 8 specifically.

6.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under § 1591(a)(1).

7.

Sex trafficking and prostitution were common occurrences at the Super 8, and Defendant chose to ignore, allow, condone, facilitate, support, or permit such activity at the hotel. Defendant is liable to Plaintiffs for its actions and failure to act. Defendant's liability to Plaintiffs is straightforward:

(a) The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person knew or should have known has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendant knowingly benefited

from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the hotel, a common undertaking involving risk and potential profit, Defendant (i) rented rooms to C.G.'s trafficker so C.G. could be violently sold for sex at the hotel, and (ii) did so despite what it knew or should have known about C.G. being a victim of sex trafficking at the hotel. As a result of Defendant's conduct, C.G. suffered physical and mental harms, and Defendant is liable to C.G. for the damages arising from those harms under the TVPRA.

(b) The Super 8 constituted a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Plaintiffs were sold for sex at the Super 8, causing them substantial harm.

(c) Because C.G. was a child when she was trafficked at the Super 8, and because Defendant knowingly facilitated her trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to C.G. for the substantive violation of 18 U.S.C. § 1591.

8.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the Super 8.

## I. C.G.'s trafficking at the Super 8.

9.

For approximately one month in the spring of 2016, C.G. was illegally harbored, falsely imprisoned, and sold for child sex at the Super 8. C.G.'s trafficker took her to the Super 8 because they knew it would be a good place to sell C.G. for sex.

10.

C.G. was trafficked at the Super 8 by a violent trafficker. She was made to have sex with roughly 6 to 7 men each day. Defendant knew or should have known that the number of daily, older male visitors to the room was clearly indicative of C.G.'s child sex trafficking at the hotel.

11.

C.G. was trafficked with other girls at the Super 8. At times, she shared a room with 5 other victims, all of whom were also being trafficked for sex. On other

occasions, the trafficker rented multiple rooms at the hotel to accommodate the large number of victims he was exploiting.

12.

C.G. and the other victims each saw roughly the same number of "dates" per day. Taken together, this resulted in approximately 35 total sex buyers visiting their rooms daily.

13.

C.G. was forced to participate in "two" and "three girl specials," during which two or three victim girls had sex with the same buyer at the same time.

14.

Defendant knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

15.

At check-in, C.G. was present in the hotel lobby with her older male trafficker, who used a fake identification to register for the room.

16.

During their stay, C.G.'s trafficker requested to change rooms on at least three separate occasions. Each time, C.G. was present in the lobby with her older male trafficker.

17.

On multiple occasions, front desk staff called the room and warned C.G.'s trafficker that police were present on the property.

18.

C.G. encountered housekeeping staff on a daily basis. While cleaning the room C.G. was trafficked in, housekeeping found trash cans filled with dozens of condoms, boxes of condoms, lube, and other paraphernalia indicating sex trafficking was occurring in the room. Defendant knew or should have known that these signs, among others, were signs of C.G.'s trafficking at the Super 8.

19.

On a regular basis, Defendant's employees knowingly removed and disposed of evidence of trafficking from the trafficker's room. This destruction of evidence was carried out in coordination with or for the benefit of the trafficker, with the effect of hindering any potential investigation into C.G.'s trafficking.

20.

While she was trafficked at the Super 8, C.G. exhibited in the common areas numerous well-known and visible signs of a child sex trafficking victim, which Defendant knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, loitering, soliciting male patrons, and monitoring and control of C.G. by her trafficker.

21.

Other sex trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches. Often, these women and children could be seen loitering around the hotel soliciting buyers of sex. Defendant knew or should have known that these were signs of sex trafficking at their hotel.

22.

Defendant knew or should have known that C.G. was being trafficked based on these signs and behaviors.

23.

While C.G. was trafficked at the Super 8, she saw many other girls and women who were obviously being sold for sex at the hotel. There was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by other anonymous men.

24.

The widespread commercial sex activity at the Super 8 attracted a significant number of buyers to the property each day. C.G. estimates that the Super 8 accommodated more than 100 buyers each day. Defendant knew or should have known that the number of daily male visitors to the hotel was clearly indicative of sex trafficking.

25.

Defendant had a policy not to call the police regarding known or suspected sex trafficking at the hotel. Defendant followed this policy in the case of C.G. as well as other sex-trafficking victims.

26.

Defendant maintained a policy or practice of allowing and facilitating sex trafficking at the Super 8, including the trafficking of C.G. This policy was implemented, in part, by agreeing to house C.G.'s trafficker and his trafficking venture, associates, and victims, and providing lookout services to evade law enforcement intervention. Additionally, Defendant knowingly and actively disposed of and destroyed physical evidence of C.G.'s trafficking for her trafficker, protecting them from potential investigation by the police.

## II. T.D.'s trafficking at the Super 8.

27.

For weeks in the spring and summer of 2013, T.D. was illegally harbored, falsely imprisoned, and sold for sex at the Super 8. T.D.'s traffickers took her to the Super 8 because they knew it would be a good place to sell T.D. for sex.

28.

T.D. was trafficked at the Super 8 by violent traffickers. Her traffickers controlled T.D. and the other girls through violence and threats of violence, including

by directing the victims to beat others who disobeyed the trafficker or failed to bring back enough money and by threatening girls with a gun. This violence occurred openly at the Super 8, including with the door to the traffickers' room open.

29.

One of T.D.'s traffickers carried a gun, which was often worn visibly tucked into his waistband.

30.

T.D. was sold for sex on the backside of the Super 8 property, where sex trafficking victims were intentionally placed by Defendant to keep them out of public view. By intentionally placing T.D. in the rear of the hotel, Defendant concealed T.D.'s traffickers' operation and minimized their risk of detection.

31.

T.D.'s traffickers rented multiple rooms at the hotel to accommodate the number of victims they were selling for sex. One room was used for sleeping and a second room was used to sell their victims for sex.

32.

T.D.'s traffickers changed rooms every few days while trafficking T.D. at the Super 8. During that time, the sleeping room was changed at least once and the "date" room at least three times. Sometimes T.D.'s traffickers requested the room changes; other times, the Super 8 moved them to different rooms. By intentionally

and repeatedly moving T.D. and her traffickers throughout the hotel, Defendant concealed T.D.'s traffickers' operation and minimized their risk of detection.

33.

T.D. was made to have sex with up to 4 men per day. Defendant knew or should have known that the number of daily male visitors to the room was clearly indicative of T.D.'s sex trafficking at the Super 8.

34.

T.D. was trafficked with other girls at the Super 8. At times, she shared a room with 3 to 4 other victims, all of whom were also being sold for sex. Each of the other victims was purchased for sex approximately as often as T.D.

35.

When the room used to sell the girls for sex was unavailable, the other girls trafficked with T.D. were sold for sex in vehicles on the Super 8 property during what were referred to as "car dates."

36.

T.D. was not permitted to go anywhere alone. Each time T.D. was purchased for sex, one of her traffickers or another girl being sold for sex escorted her to the room used to sell sex. T.D.'s traffickers also sometimes sat outside the room used to sell sex while T.D. and the other victims were being purchased for sex inside. On

several occasions, T.D. left the room immediately after and handed the money she had just received to her trafficker waiting outside.

37.

T.D. and other girls selling sex frequently spent time in plain view throughout the hotel, its premises, and its approaches wearing very little clothing, including short shorts, tube tops, high heels, and fishnet stockings. Their clothing was revealing and conspicuous and nothing a normal person would wear walking down the street.

38.

Male employees and other men at the hotel regularly harassed T.D. and other girls being sold for sex in plain view. They would catcall and whistle at the girls and make sexually explicit gestures toward them, including thrusting their hips as if to simulate sex and making a "V" with their fingers while sticking their tongues through it.

39.

While she was trafficked at the Super 8, T.D. exhibited in the common areas well-known and visible signs of a sex trafficking victim, which Defendant knew or should have known, including her inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, no control of or possession of money,

loitering, soliciting male patrons, and monitoring and control by her traffickers, including a man with a gun.

40.

Employees of the Super 8 were familiar with and accommodated T.D.'s traffickers and the members of their sex trafficking operation. A male employee working behind the front desk greeted at least one member of the group trafficking T.D. by name, came around the desk to hug her, and laughed and joked with the her, which signaled a level of familiarity and rapport that went beyond mere recognition.

41.

On another occasion, the Super 8 front desk employee purchased one of the members of T.D.'s traffickers' sex trafficking operation for sex at the Super 8 in the room the group used specifically for dates.

42.

T.D. encountered housekeeping staff regularly. T.D. and the other victims constantly requested towels, rags, and clean sheets. While cleaning the rooms T.D. was trafficked in, housekeeping found drugs, including weed, pills, and cocaine, a gun, trash cans filled with used condoms and condom wrappers, boxes of condoms, bloody condoms and wipes, and girls in lingerie.

43.

T.D. tried to alert Super 8 employees to her trafficking. She intentionally left used condoms in the trash cans, on the floor, and under the covers for housekeeping to find. When she heard housekeeping nearby, T.D. also stood outside the room in provocative clothing so that employees would see her and recognize that something was wrong.

44.

On a regular basis, Defendant's employees knowingly removed and disposed of evidence of trafficking from the trafficker's room. This destruction of evidence was carried out in coordination with or for the benefit of the traffickers, with the effect of hindering any potential investigation into T.D.'s trafficking.

45.

Once, a male Super 8 employee commented on T.D.'s appearance and asked how much it would cost to purchase her for sex.

46.

While T.D. was trafficked at the Super 8, she saw many other girls and women who were obviously being sold for sex at the hotel. These women and children wore skimpy clothes throughout the hotel parking lot and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these

women and children for short periods of time before leaving and being followed by other anonymous men.

47.

Defendant had a policy not to call the police regarding known or suspected sex trafficking at the hotel. Defendant followed this policy in the case of T.D. as well as other sex-trafficking victims.

48.

Defendant maintained a policy or practice of allowing and facilitating sex trafficking at the Super 8, including the trafficking of T.D. This policy was implemented, in part, by agreeing to house T.D.'s traffickers and their trafficking venture, their associates, and their victims; intentionally placing and moving the trafficking operation throughout the hotel to conceal it and minimize the traffickers' risk of detection; and knowingly removing and disposing of physical evidence of trafficking. Through these acts and practices, Defendant's employees signaled to her traffickers that the Super 8 was a safe haven where they could conduct their sex-trafficking operation without interference or detection.

## III. Defendant's knowledge of crime at the Super 8.

49.

The Super 8 had a well-established reputation for criminal activity, including prostitution and sex trafficking.

50.

Before, during, and after Plaintiffs' child sex trafficking at the Super 8, prostitution, sex trafficking, and child sex trafficking were rampant and frequent occurrences at the hotel and were obvious to employees and guests.

51.

Defendant owned, operated, managed, franchised, or otherwise controlled the Super 8 and employed or controlled employees there, giving it specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that period.

52.

Terrence Jefferson, whose declaration is attached to this Complaint,[1] was employed as a maintenance worker at the Super 8 from approximately late 2013 through 2016. During that period, he worked seven days per week and resided at the hotel.

53.

During his employment at the Super 8, Jefferson regularly observed prostitution, sex trafficking, drug activity, and other criminal activity occurring on the property.

---

[1] See Ex. 1, Terrence Jefferson Declaration.

54.

According to Jefferson, the women and girls being sold for sex dressed in skimpy clothing, including fishnets, high heels, and heavy makeup, would loiter around the property and enter hotel rooms with adult men who would leave shortly afterward. Some of these girls appeared obviously underage and looked as though they were in middle school.

55.

Beginning as early as 6:00 a.m., Jefferson would observe these women and girls walk along the road near the Super 8, soliciting buyers of sex and bringing them back to the Super 8.

56.

Jefferson observed individuals whom he understood to be pimps openly supervising women and girls engaged in the commercial sex activity on the property. Jefferson specifically recalls one girl who appeared extremely young—like she was in middle school—who was closely controlled by an older male pimp who monitored her whenever she left the room.

57.

The pimps would sit outside hotel rooms while buyers of sex entered and exited. After each buyer was done, the pimp would collect the money outside the room.

The pimp would go back into the room and come back out. Another buyer would come in, and this would happen all over again.

58.

While performing maintenance duties, Jefferson responded to complaints in rooms where women and girls were being sold for sex. On one occasion, he entered a room after a guest complained that the room was too hot and observed approximately 30 to 40 used condoms scattered on the floor. Jefferson encountered similar conditions multiple times while performing his job duties.

59.

According to Jefferson, housekeeping staff routinely encountered the same conditions while cleaning rooms, including dozens of used condoms that staff were required to clean up.

60.

According to Jefferson, hotel management and staff were fully aware of the prostitution and sex trafficking occurring at the Super 8. The office manager, owner, and other employees regularly walked the property and could monitor the activity through security cameras located in the office.

61.

The Super 8's owner, office manager, and employees had opportunity to observe—and did observe—the prostitution, sex trafficking, and related criminal activity occurring on the property.

62.

Jefferson further states that management maintained a practice of placing individuals involved in prostitution, drugs, and sex trafficking on the back side of the hotel while placing other guests, including airline employees and layover guests, on the front side of the property, which employees referred to as the "good side" of the hotel.

63.

According to Jefferson, although the hotel would remove some guests who failed to pay for their rooms, Super 8 management routinely allowed individuals involved in prostitution and sex trafficking to remain on the property.

64.

Terrell Evans, whose declaration is attached to this Complaint,[2] stayed at the Super 8 off and on from 2012 to 2015. During that time, she worked at the Super 8 as an independent prostitute and visited other friends that were also "in the life."[3]

---

[2] See Ex. 2, Terrell Evans Declaration.

[3] "In the life" is a term commonly used to refer to involvement in the commercial sex industry. *See, e.g.,* Shared Hope International, *Sex Trafficking Terms &*

65.

According to Evans, drugs and prostitution were pervasive throughout the hotel. Evans observed girls dressed in skimpy clothing constantly present on the property, and men coming in and out of rooms for short periods of time.

66.

Evans observed numerous girls being sold for sex at the property—many of whom appeared to be middle-school age. These young girls walked the property soliciting men for sex and used the long driveway to bring buyers back to a room.

67.

Evans also saw pimps stationed outside rooms while girls were inside engaged in commercial sex acts.

68.

Defendant provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why Plaintiffs' trafficker(s) brought them to the Super 8 to be sold for child sex.

69.

The prostitution and sex trafficking at the Super 8 were not confined to individual hotel rooms. Women and girls being sold for sex openly occupied and

*Definitions*, https://sharedhope.org/the-problem/trafficking-terms/ (last visited October 6, 2026).

solicited throughout the hotel's common areas, parking lot, and exterior areas; walked the surrounding street soliciting sex buyers and brought them back to the Super 8; and engaged in commercial sex in vehicles on the property. Pimps openly supervised women and girls throughout the property, waited outside rooms while buyers purchased them for sex, and collected money after buyers left.

70.

For years, Defendant permitted the Super 8 to operate as a hub for prostitution and sex trafficking that attracted a continuous flow of sex buyers, pimps, drugs, violence, and other criminal and dangerous activity to the property and surrounding area. Defendant provided the rooms and property where women and girls were sold for sex, permitted traffickers and sex buyers to use the hotel for that purpose, and segregated prostitution, sex trafficking, drugs, and related criminal activity to the back of the property.

71.

By permitting these conditions to persist for years, Defendant caused or contributed to an appreciable blighting effect on the Super 8 and its surrounding area. The effects of the prostitution and sex-trafficking nuisance extended beyond individual hotel rooms and throughout the hotel's common areas, parking lot, driveway, exterior areas, and approaches and onto the surrounding street. Women and girls solicited buyers throughout these areas, commercial sex occurred in vehicles on the

property, and women and girls left the hotel to solicit buyers along the street and bring them back to the Super 8.

72.

Thus, the effects of the prostitution and sex-trafficking nuisance Defendant permitted at the Super 8 reached all persons who came within its sphere of operation. Hotel guests, residents, employees, visitors, and members of the surrounding community were exposed to the prostitution, sex trafficking, solicitation, drugs, violence, armed pimps, sex buyers, and other criminal and dangerous activity that Defendant permitted to persist at and around the Super 8.

73.

The victims—girls and women—being trafficked for sex were harmed by the prostitution and sex trafficking nuisance at the Super 8. They were sold for sex and beaten. Residents of the Super 8 were harmed by the constant presence of prostitution and sex trafficking in the place they were forced to reside. The surrounding community who encountered the crime, trauma, and acceptance of prostitution and sex trafficking at the Super 8 was harmed by witnessing and encountering that type of pervasive crime. It was "an environment that would be dangerous and unhealthy for anyone[.]" *Northfield Ins. Co. v. Northbrook Indus., Inc.*, 749 F. Supp. 3d 1325, 1338 (N.D. Ga. 2024), *appeal dismissed sub nom. Northfield Ins. Co. v. N. Brook Indus., Inc.*, 176 F.4th 1268 (11th Cir. 2026). Being kept "in a dangerous setting

where prostitution, drugs, and weapons were ubiquitous" causes harm to those who must live in, visit, and experience such a dangerous setting. *Id.* In short, everyone who encountered the sex trafficking nuisance at the Super 8 was harmed by it.

74.

Defendant had actual or constructive knowledge of the Super 8's publicly available online reviews that reported prostitution and crime at the hotel, including the following (reproduced verbatim):

1. August 22, 2014, from Yelp.com:

   The motel is the cheapest in the city and i guess its like the saying goes, u get what u pay for! however i did not pay for roaches,MOLD, mildew, prosititution or any other disgusting thing u can think of! however they did have beautiful rooms in the front of the motel and upstairs i guess thats the non smokers section!O and dont be mislead by the continental breakfast... wifi messes up ur technology!

2. December 12, 2015, from Yelp.com:

   I have never given a bad review--but in this case I feel a responsibility to warn others that this place is scary filthy and that it has become a prostitute haven. . . .

3. July 13, 2016, from Yelp.com:

   This place is beyond horrendous. I ended up sleeping in my car. While driving out of this location I realized the women running to the doors and walking around are prostitutes. NASTY! I rated this place with one star because I could not post my review without one. But Super 8 own me stars.

4. May 2017, from Google.com:

I will start by saying that this place is very ghetto! I was scared to take my child to the pool and when we did go it was closed because people from other places where there, the water and pool looked nasty. Breakfast literally sucks! Next to a very busy high way. I will say the room was okay but very old fashion and the restroom need some work done. I believe prostituion goes on, drug deals, ect. Employee don't care smoke on the job. DONT WAIST YOUR TIME OR MONEY HERE !

5. <u>July 2017, from TripAdvisor.com:</u>

This place was horrible. it had an awful smell to the rooms. there were holes in the walls. The breakfast was not eatable. customer service was awful. bad attitudes. the shower curtain had mold on it! The floor was so dirty that the bottoms of her feet were black from just walking and playing without socks or shoes on! There was trash all over the ground outside. There were prostitutes there using the rooms to do their business! You could tell by looking at the people that they were working girls. The TV had to warm up before it would play so that we could see it. The noise from the traffic that is right beside the hotel interferes with your sleep. No microwave. No refrigerator. The bed sheets were not changed once while we were there. Had to ask for clean towels and rags. Do not stay here please. It was awful. We stayed gone all day because we did not want to sit in those rooms all day.

6. <u>July 2017, from TripAdvisor.com:</u>

This place was disgusting. I could understand if it was $40 but we paid $91 at a DISCOUNT! We booked it through the Super 8 hot-line while on the road stating we just needed a clean room to stay in between drives. This place was advertised as just that. The sink regurgitated something of throw up (noodles), the tv and internet didn't work, the a/c didn't work, the bathroom was gross and the toilet leaked on the floor, there were wiped stains on the curtains. We looked at the conditions of the check out policy and we would-n't have been refunded after the first 15 minutes. Also, we were 2 women that were in a city on a Saturday night and it was raining. We had no choice but to stay. I complained to the the attendant in the office and she said no one from housekeeping was there. I

asked for liquid plummer for the sink. It was under lock and key so I asked for a coke to see if that would unclog it. Then a prostitute came in. She was nice but funny she even said it was overpriced! We tried to sleep. Until I felt something crawl on me. A bed bug!!! We asked for garbage bags to put our things in until we could get home. Most disgusting place EVER!!!

7. <u>July 2017, from Kayak:</u>

   This is not a hotel for travelers, bring wet wipes, and some twenties for the professional "ladies"

8. <u>May 2018, from Google.com:</u>

   It's a dump full of drugs and prostitution

9. <u>November 5, 2018, from Expedia.com:</u>

   DO NOT STAY HERE. Look at the pictures ......nuff said. Condoms in the vending machine right next to the Oreos....

10. <u>September 24, 2018, from Expedia.com:</u>

    I paid extra for breakfast however the breakfast was just a few bagel, bread, and muffins and orange juice. Although I asked for a nonsmoking room but when I was in there with my fiancée and 9 month-old son, the room smelled like a drug infested room. In addition, we weren't able to sleep throughout the night because there were people making noise and banging on the next door like it was prostitution or drugs dealing.

11. <u>July 2019, from TripAdvisor.com:</u>

    Dirty, Noisy, Unsafe. Overall safety is a concern on this property. There are constantly people walking around look like they are not staying at the hotel. It has a very drug dealer / prostitution feeling about it. Although none of that can be confirmed, it does affect the feeling of the environment. There's too much loitering in my opinion. The room that I had was not cleaned very well. Hair was in the toilet and bathtub. There are stains of either blood or ketchup or

BBQ sauce on the walls and sheets. I was only there for two nights and that is the reason why I did not report these things to the front desk. I just needed my stay to be fluid and without incident as much as possible. However, these concerns definitely need to be addressed. I understand that the price is low, but a good reputation is always precedent over money. If this hotel would invest in the upkeep & creating a safer culture then it could probably charge more. It should also be noted that aircrafts land overhead which is very noisy and hotel is located right on the interstate and that means lots of noise from the traffic

12. <u>July 9, 2019, from Expedia.com:</u>

ROACHES EVERYWHERE. PROSTITUTION. OLD BUILDING. TERRIBLE. STAY AWAY I SHOULD HAVE LISTENED TO THE PEOPLE DOING REVIEWS.

13. <u>July 31, 2019, from Yelp.com:</u>

Stayed here two months and was discriminated against due to being trans and the staff member MIKE sexually harassed me the whole time off and on I was place on do not rent for not performing sexual request to mike who is the person who works front desk and walk into guest rooms unannounced while guest are away from property items come up missing they don't know what happened mike will lie on you and say you did something that u couldn't have done and when caught in a lie he get mad and says you are yelling at him etc this Super 8 is staffed with horrible disgusting people who are money hungry don't care about customer service at all I would recommend the best American inn, Ramada, quality inn, days inn Super 8 will be a WASTE OF MONEY PROSTITUTION AND STAFF INDULGENCE STAFF SNORT COCAINE AT WORK SMOKE WEED AT WORK WHILE ON THE CLOCK STAFF BRING THEY CHILDREN TO WORK WITH THEM AND LET THEM RUN WILD AROUND THE PROPERTY LEAVING TOYS ETC STAFF BREAKING INTO CARS belonging to people who park and fly DONT PARK AND FLY HERE DONT LEAVE YOUR CAR HERE THEY DONT WATCH ANYTHING CAM-ERASDONT WORK

75.

Defendant knew or should have known of these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

76.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the Super 8. Much of this activity either alerted or should have alerted Defendant to the hotel's rampant sex trafficking, prostitution, and sex crime problem.

77.

Defendant and its employees knew or should have known that obvious sex trafficking, including Plaintiffs' sex trafficking, was occurring at its property, at times with the assistance of its employees.

78.

Despite the dangerous, illegal, and criminal activity surrounding the property, Defendant negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

79.

Despite having actual or constructive knowledge of this illegal activity, Defendant negligently failed to take reasonable steps to stop such illegal and dangerous activities from occurring, including that involving its own employees.

80.

Additionally, Defendant negligently failed to provide proper training to its employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the hotel.

81.

Defendant also negligently failed to supervise its employees to ensure the hotel was not facilitating sex trafficking and participating in sex trafficking through the business of the hotel, as was the case with Plaintiffs' trafficking.

82.

Defendant also negligently failed to train its staff in a reasonable and uniform manner, including, among other things, how staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so the hotel could better deter or prevent crime in the future.

83.

Defendant also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at

the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

84.

Defendant knew or should have known that it was permitting the hotel to be used as a place of prostitution and sex trafficking.

**IV. Defendant's knowledge of sex trafficking generally.**

85.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

86.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Super 8. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000. Over the last two decades, sex trafficking has generated billions of dollars

in illicit profits in metro Atlanta alone. Defendant received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiffs.

87.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[4] and as "the number one city for child sex trafficking."[5]

88.

Defendant knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

89.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and

---

[4] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited October 6, 2026).

[5] *Id.*

obtained information on involving motels and hotels were sex trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[6] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[7] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[8] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[9]

90.

Defendant knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[10] and that the industry had been

[6] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://respect.international/wp-content/uploads/2020/11/National-Hotline-Cases-Occurring-in-Hotels-and-Motels-.pdf (last visited October 6, 2026).

[7] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https.www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[8] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited October 6, 2026).

[9] *Id.* at 23.

[10] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality*

warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[11]

91.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[12]

92.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

(a) establish corporate policy and procedures against sexual exploitation of children;

(b) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

---

*Industry* 6 (presentation at AHIA Sprint Conference 2013), https://perma.cc/X5DG-YQ3M.

[11] *Id.* at 19.

[12] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited October 6, 2026).

(c) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f) report annually on the company's implementation of Code-related activities.

93.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

94.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(a) persons who lack freedom of movement or are constantly monitored;

(b) persons who have no control over or possession of money or ID;

(c) persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(d) requests for room or housekeeping services (additional towels, new linens, etc.), but denial of Motel staff entry into the room;

(e) the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(f) extended stay with few or no personal possessions in the room;

(g) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(h) the same person reserves multiple rooms;

(i) a room is rented hourly, less than a day, or for an atypical extended stay;

(j) attempts to sell items to or beg from patrons or staff;

(k) cars in the parking lot regularly parked backward, so the license plates are not visible;

(l) loitering and solicitation of male patrons;

(m) waiting at a table or bar and picked up by a male (trafficker or customer);

(n) persons asking staff or patrons for food or money; and

(o) persons taking cash or receipts left on tables.

95.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiffs' cases, the Super 8, for a fee, provided this market for Plaintiffs to be confined and sold.

**COUNT I**
**STATUTORY LIABILITY: SEX TRAFFICKING**
**18 U.S.C. § 1595**
*(Plaintiff C.G.)*

96.

C.G. incorporates the paragraphs above as if fully restated herein.

97.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefited from participation in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

98.

Defendant knowingly benefited from C.G.'s sex trafficking by receiving revenue generated by the operation of the Super 8, including the revenue generated for the rooms in which C.G. was trafficked. Each day C.G. was trafficked at the Super 8, Defendant knowingly benefited by receiving money from C.G.'s trafficking in the form of room-rental fees.

99.

Defendant participated in a hotel venture and knew or should have known that its operation, ownership, management, franchising, or control of the Super 8 violated the TVPRA by harboring and falsely imprisoning C.G. so that she could be sold for sex at the hotel. Defendant also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing C.G.'s sex trafficker to harbor, falsely imprison, and traffic C.G. at the Super 8.

100.

As part of her sex trafficking, C.G. was falsely imprisoned at the Super 8. Defendant also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing C.G.'s sex trafficker to harbor, falsely imprison, and traffic C.G. at Defendant's hotel.

101.

The venture in which Defendant participated was in or affecting interstate commerce.

102.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives participated in C.G.'s child sex trafficking at the Super 8. Defendant knew or should have known of this participation.

103.

Defendant also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Super 8.

104.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of its agents and representatives.

105.

C.G. has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

106.

Defendant is liable to C.G. for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

107.

Defendant is liable for damages arising from the injuries it caused C.G., whose damages were proximately caused by the acts discussed in this count.

**COUNT II**
**STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255**
*(Plaintiff C.G.)*

108.

C.G. incorporates the paragraphs above as if fully restated herein.

109.

C.G. was under the age of 18 when she was trafficked at the Super 8.

110.

C.G. was a victim of violations of 18 U.S.C. § 1591 at the Super 8.

111.

As described herein and specifically in paragraphs 9–95, Defendant knowingly benefited from participating in a venture that it knew or should have known engaged in an act of sex trafficking at the Super 8, including the harboring and other trafficking activities which harmed C.G.

112.

C.G. suffered injuries as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

113.

Thus, as described herein, Defendant is liable to C.G. for compensatory and punitive damages, in an amount to be determined at trial.

**COUNT III**
**NUISANCE**
*(Plaintiffs C.G. and T.D.)*

114.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

115.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

116.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

117.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

**Public Nuisance**

118.

The Super 8's history of rampant crime and illegal sex activity created a spill-over effect that led to other crime occurring in the surrounding area.

119.

The Super 8 caused or contributed to a blighting effect on the surrounding community, so that the Super 8 negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Super 8, although the effects on each person may have varied.

120.

The illegal prostitution and sex trafficking nuisance occurring at the Super 8 had an appreciable blighting effect on the surrounding community, permitted persons of questionable character, encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

121.

The acts and omissions of Defendant in permitting prostitution and sex trafficking at the Super 8 caused special damages to Plaintiffs, as they were victims of child sex trafficking at Defendant's nuisance hotel and suffered damages to their health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiffs for all such damages.

**Public Nuisance Per Se**

122.

The Super 8 constituted a nuisance per se under Georgia law because Defendant knowingly and/or negligently turned a blind eye and permitted illegal sexually related crimes to occur at the Super 8, including sex trafficking.

123.

A business where illegal practices are permitted constitutes a nuisance.

124.

A business, like the Super 8, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

125.

Plaintiffs were directly harmed as a result of the sex crime nuisance at the Super 8 that permitted illegal sexual activity to occur there.

126.

Defendant is liable for nuisance (public nuisance and/or per se public nuisance) by reason of its failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendant had express notice and knowledge, and whereby Plaintiffs were direct victims of such activity.

## DAMAGES

127.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

128.

As a proximate and foreseeable result of Defendant's violations of the TVPRA and Georgia law, Plaintiffs sustained physical injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiffs bring each and every claim permissible under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, actual, general and punitive damages permissible under Georgia and federal law. Plaintiffs seek all compensatory, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a) Physical injuries;

(b) Past, present and future conscious pain and suffering;

(c) Loss of enjoyment of life;

(d) Mental anguish and emotional distress;

(e) Incidental expenses;

(f) All compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

(g) Consequential damages to be proven at trial.

129.

Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendant and its employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

130.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs undue expense. Thus, Plaintiffs are entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiffs are entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendant for the following:

(a) Process issue as provided by law;

(b) Plaintiffs be awarded actual damages in amounts to be shown at trial from Defendant;

(c) Plaintiffs be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

(d) Plaintiffs be awarded a trial by jury; and

(e) Plaintiffs have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on October 15, 2026.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097

(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

**CERTIFICATE OF COMPLIANCE**

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile